UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MIDWEST STORAGE DEVELOPERS, LLC,
323 Columbia Street, Suite 300
Lafayette, Indiana 47901

Plaintiff,

-vs-

CROWN HOLDINGS, INC.,
f/k/a/ Crown Cork & Seal Company, Inc.,
9300 Ashton Road
Philadelphia, Pennsylvania 19136

SONOCO PRODUCTS COMPANY,
1 North Second St.
Hartsville, South Carolina 29550

GREIF, INC.,
f/k/a Greif Brothers Corporation
425 Winter Road
Delaware, Ohio 43015

Defendants.

**VERIFIED COMPLAINT**

Civil No.:

**TRIAL BY JURY DEMAND**

---

Plaintiff Midwest Storage Developers, LLC ("Midwest" or "Plaintiff"), by and through its attorneys, Rupp Pfalzgraf LLC, as and for its Complaint against Defendants Crown Holdings, Inc., f/k/a Crown Cork & Seal Company, Inc. ("Crown"); Sonoco Products Company ("Sonoco"); and Greif, Inc. f/k/a Greif Brothers Corporation ("Greif") (collectively, "Defendants") alleges the following:

1. This is a civil action arising under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"), to recover

response costs Plaintiff has incurred, and will continue to incur, in connection with the investigation, monitoring, management, and remediation of hazardous substance contamination at Plaintiff's property located at 2122 Colvin Boulevard, Town of Tonawanda, Erie County, New York (the "Site").

2. Plaintiff seeks recovery of necessary response costs pursuant to CERCLA § 107(a) and contribution pursuant to CERCLA § 113(f), together with declaratory relief for future response costs pursuant to 42 U.S.C. § 9613(g). Plaintiff also seeks relief under the New York Navigation Law and common law for private nuisance, trespass, unjust enrichment, contribution, and indemnification arising from Defendants' historic ownership, operation, and contamination of the Site.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 9607 and 9613, without regard to the amount in controversy or the citizenship of the parties.

4. This Court has supplemental jurisdiction over Plaintiff's state common law claims because those claims form part of the same case or controversy as Plaintiff's CERCLA claims pursuant to 28 U.S.C. § 1367.

5. Venue is proper in this District because the Site is located in this District, the releases and threatened releases at issue occurred in this District, and the response actions for which Plaintiff seeks recovery were and are being undertaken in this District.

## FACTUAL BACKGROUND

### A. Corporate Ownership and Operator History

6. Beginning in or about 1948, the Site was developed and operated as an industrial manufacturing facility for the production of fiber drums, or cylindrical containers used for the storage and transportation of a wide range of solid and semi-liquid materials utilized in commercial and industrial applications.

7. From approximately 1948 to 1985, the Site was owned and operated by an entity known as by Continental Can Company, Inc., (later known as The Continental Group, Inc.) ("The Continental Group"), identified in the chain of title as an owner of the Site at the commencement of the Site's industrial operations pursuant to a deed recorded at Liber 4228 of Deeds at page 311, a true and correct copy of which is attached hereto as **Exhibit A**.

8. Upon information and belief, Continental Can Company, Inc., later known as The Continental Group, served as the parent corporation that owned and controlled the specific entities that both held title to and operated the Site from approximately 1948 to 1985.

9. During this same period, the Site was partially owned and operated by an entity known as Continental Fibre Drum, Inc., ("Continental Fibre") identified in the chain of title as a prior owner of the Site pursuant to a deed recorded at Liber 9408 of Deeds at page 565, a true and correct copy of which is attached hereto as **Exhibit B**. Upon information and belief, Continental Fibre is alleged to have been a subsidiary of Continental Can Company, Inc., and served as the specific corporate division responsible for conducting the Site's operations.

10. New York State Department of Environmental Conservation ("NYSDEC") records also identify an entity known as "Continental Can Corporation" as a prior

corporate owner of the Site along with Continental Can Company, Inc. All entities responsible for ownership and operation of the Site during the initial industrial period of 1948 to 1985, including Continental Fibre and Continental Can Corporation were, upon information and belief, entities within Continental Can Company, Inc., a/k/a The Continental Group's greater corporate enterprise.

11. In or about 1985, Defendant Sonoco Products Company ("Sonoco") acquired Continental Fibre (then renamed KMI Continental Fibre), which became Sonoco's wholly-owned subsidiary. Sonoco thereafter continued the same fiber drum manufacturing operations previously conducted through the continuation of KMI Continental Fibre's operations until approximately 1991 when KMI Continental Fibre was formally renamed to reflect Sonoco's ownership.

12. In or about March 1998, Greif Brothers Corporation, ("Greif Bros.") (now known as Defendant Greif, Inc., "Greif"), acquired Sonoco Products Company's industrial container business, including all outstanding shares KMI Continental Fibre as Sonoco's wholly owned subsidiary and operating entity responsible for the Site. Through that acquisition, Defendant Greif became Sonoco's corporate successor to the Site's fiber drum manufacturing operations.

13. Greif Bros., now Defendant Greif, is further identified in the chain of title as a prior owner of the Site pursuant to deeds recorded at Liber 11003 of Deeds at page 4907, a true and correct copy of which is attached hereto as **Exhibit C**.

14. In or about 2005, title to the Site was further transferred to an entity known as Greif Containers Inc., which was later renamed to Greif Packaging LLC, pursuant to a deed recorded at Liber 11092 of Deeds at page 6180, a true and correct copy of which is attached

hereto as **Exhibit D**. Upon information and belief, Greif Containers, now Greif Packaging LLC, is an entity wholly owned and affiliated within Defendant Greif's greater corporate structure.

15. At the time of transfer to Plaintiff in July 2021, title to the Site was held by Greif Packaging LLC, which conveyed the property to Plaintiff pursuant to a deed dated July 16, 2021 and recorded at Liber 11384 of Deeds at page 860, a true and correct copy of which is attached hereto as **Exhibit E**.

16. The July 16, 2021 deed identifies Greif Packaging LLC as the grantor and reflects execution on its behalf by Defendant Greif as its sole member, demonstrating that Defendant Greif exercised ownership and control over the Site through its affiliated corporate entities at the time of transfer.

17. Greif Packaging LLC is not named as a defendant in this action because, in connection with Plaintiff's acquisition of the Site, Plaintiff entered into a Purchase and Sale Agreement with Greif Packaging LLC that included certain releases and indemnification provisions regarding environmental contamination at the Site running in favor of Greif Packaging LLC. Therefore, Plaintiff asserts no claims against Greif Packaging LLC as part of this action.

18. Following its acquisition on July 16, 2021, Plaintiff Midwest Storage Developers, LLC became the current owner of the Site. Plaintiff subsequently entered into a Brownfield Cleanup Agreement ("BCA") with NYSDEC on June 13, 2022. A copy of the BCA is attached hereto as **Exhibit F**.

19. Through the above-outlined chain of title and operating entities for the Site, Defendants Sonoco Products Company and Greif, Inc. are established prior owners and/or operators of the Site and are strictly liable pursuant to 42 U.S.C. § 9607(a).

**B. Corporate Chain of Succession for Defendant Crown Cork and Seal Company, Inc. a/k/a Crown Holdings, Inc.**

20. Defendant Crown Cork & Seal Company, Inc. (now known as Crown Holdings, Inc.) ("Crown") is a corporation that, upon information and belief, acquired substantial portions of The Continental Group following its acquisition and subsequent breakup in the mid-1980s. Crown is named in this action as a successor to the liabilities associated with The Continental Group, including liabilities arising from the ownership and operation of the Site during the initial industrial operations period from approximately 1948 through 1985.

21. In or about 1984, The Continental Group, (formerly Continental Can Company, Inc.), including the prior owner and/or operators of the Site Continental Can Corporation and Continental Fibre were acquired through a leveraged buyout by Kiewit-Murdock Investment Corporation ("KMI") an entity formed, *inter alia*, and upon information and belief, for the purpose of purchasing, restructuring, and selling off portions of The Continental Group.

22. Upon information and belief, following KMI's acquisition, The Continental Group was broken up and its business divisions, assets, and operations were sold, transferred, or otherwise distributed to various entities, which included Sonoco's purchase of then KMI Continental Fibre[1] in 1985. Upon further information and belief, the domestic packaging and industrial container operations of The Continental Group, including those associated with fiber drum manufacturing and related industrial activities of the type conducted at the Site, were among the various business lines sold during this breakup process.

[1] Upon information and belief, KMI Continental Fibre Drum, Inc. no longer exists as a separate corporate entity, having been dissolved, merged, and/or otherwise absorbed into Defendant Greif, Inc. following Greif's acquisition of Sonoco's industrial container business in or about 1998.

23. Upon information and belief, Defendant Crown also thereafter acquired substantial portions of The Continental Group's United States domestic metal packaging operations in or about 1990.

24. Upon information and belief, Crown's acquisition included business lines that were part of The Continental Group responsible for the ownership and operation of the Site throughout approximately 1948 through 1985, when the industrial activities giving rise to releases at the Site occurred. Upon further information and belief, Crown expressly and/or impliedly assumed liabilities associated with The Continental Group's Site operations, including environmental liabilities arising from the ownership and operation of the industrial facilities and operations at the Site.

25. Accordingly, Crown is named in this action as a successor entity to The Continental Group which previously owned the entities responsible for the Site from approximately 1948 – 1985, and may be liable, in whole or in part, for releases at the Site arising from that period.

### C. Site-Specific Operations Leading to Environmental Releases of Hazardous Substances Across All Ownership Periods

26. From approximately 1948 until 1985, during the ownership and operational period of Continental Can Company, Inc. a/k/a The Continental Group, the Site functioned as an active industrial facility engaged in the manufacture of fiber drums and the production of associated metal lids and rims.

27. These processes required coating, varnishing, and degreasing of metal components and routinely involved the use, storage, and handling of varnish, industrial solvents, lubricants and other petroleum-related materials.

28. Specifically, the Site's industrial operations during this period involved the use, storage, and handling of hazardous substances within the meaning of CERCLA, including chlorinated volatile organic compounds ("VOCs") such as trichloroethene (TCE) and 1,1,1-trichloroethane (TCA); other VOCs including benzene, toluene, ethylbenzene, xylenes, semi-volatile organic compounds ("SVOCs"), and other petroleum-related compounds associated with fuels, oils, and solvents used in the Site's operations. These substances are further identified in NYSDEC Brownfield Cleanup Program ("BCP") records as contaminants which remain present at the Site.

29. During this period, the Site was configured to create specific process and storage areas used to streamline the Site's operations, including a varnish pit, underground storage tanks used to store varnish, industrial solvents and other chemicals, and drum storage and staging areas used for the handling and storage of materials throughout production.

30. The same above-identified areas are identified in NYSDEC Site records as locations where releases of hazardous substances occurred during the course of the Site 's industrial operations, including the former varnish pit, associated underground storage tanks, and drum storage areas, directly linking those areas and others to releases of hazardous substances associated with Site activities.

31. Upon information and belief, during Continental Can Company, Inc. a/k/a The Continental Group's initial ownership period from 1948-1985, hazardous substances were released into the environment at the Site in connection with these industrial activities, including through spills, leaks, disposal practices, and/or migration from Site operations and storage areas, including but not limited to into soil and groundwater.

32. In or about 1985, following Defendant Sonoco's acquisition of KMI Continental Fibre's drum manufacturing operations, Sonoco continued to operate the Site via KMI Continental Fibre as its wholly owned subsidiary as an active industrial manufacturing facility using substantially the same materials, processes, infrastructure, and operational areas established during the prior ownership period.

33. These operations continued to include coating, varnishing, and degreasing processes utilizing the same categories of hazardous substances, including chlorinated solvents (such as TCE and TCA), petroleum-based solvents, and VOC mixtures, and continued to utilize the same source areas associated with contamination, including the varnish pit, underground storage tanks, and drum storage areas.

34. Upon information and belief, releases of hazardous substances continued throughout Sonoco's ownership, further contributing to the Site's contamination.

35. Defendant Sonoco subsequently entered into NYSDEC's prior Voluntary Cleanup Program ("VCP") and entered into a Voluntary Cleanup Agreement ("VCA") with NYSDEC dated May 24, 2001, pursuant to which it undertook investigation and remediation of contamination at the Site, including Site investigations, dense non-aqueous phase liquid ("DNAPL") recovery, soil excavation and removal, and evaluation of remedial alternatives. Sonoco was also specifically identified as the remedial party responsible for performing such work under the VCA.

36. On or about May 18, 2016 in, *Town of Brookhaven v. Metropolitan Transportation Authority*, Index No. 2015-04273 (Sup. Ct. Suffolk Cty.), the court issued an Order and Judgment holding that NYSDEC lacked statutory authority to create and administer the VCP and declared the program *ultra vires* and contrary to law. That determination was

subsequently reaffirmed in *Town of Brookhaven v. Metropolitan Transportation Authority*, 2018 NY Slip Op 31765(U) (Sup. Ct. Suffolk County), in which the court recited and relied upon its May 18, 2016 Order and Judgment and again recognized that the VCP was beyond NYSDEC's authority. Following that ruling, NYSDEC proceeded to wind down the VCP.

37. Following completion of Defendant Sonoco's VCP work, NYSDEC issued a Release and Covenant Not to Sue to Sonoco effective March 16, 2018. However, the release was issued after remedial work had been completed for commercial use only and further expressly recognized that residual Site contamination remained subject to engineering and institutional controls, recorded deed restrictions, and continuing Site Management Plan obligations.

38. Accordingly, Sonoco's March 16, 2018 Release and Covenant Not to Sue represents, at most, an arrangement between NYSDEC and Sonoco concerning NYSDEC's own enforcement position under the VCP. It did not represent that all contamination at the Site was remedied, did not release claims held by private parties, did not bind Midwest, and does not provide Sonoco with any defense to Plaintiff's claims, including but not limited to recovery of response costs, contribution, or declaratory relief under CERCLA.

39. Although Defendant Greif acquired Defendant Sonoco's industrial container business in or about March 1998, including all outstanding shares of Sonoco's wholly owned subsidiary KMI Continental Fibre Drum, Inc., that operated the fiber drum manufacturing operations at the Site, Defendant Sonoco nevertheless remained the identified remedial party under the Voluntary Cleanup Agreement entered into with NYSDEC in 2001.

40. Accordingly, from the time of Defendant Greif's acquisition of Defendant Sonoco's industrial container operations in or about March 1998, Defendant Greif became the

successor to KMI Continental Fibre Drum, Inc.'s Site operations and continued to own and operate the Site as an active industrial manufacturing facility, while Defendant Sonoco remained responsible under the VCA for investigation and remediation of legacy contamination associated with its prior ownership and operation of the Site.

41. Further, following Defendant Greif's acquisition of KMI Continental Fibre Drum, Inc., Defendant Greif continued fiber drum manufacturing operations at the Site. However, NYSDEC records indicate that the production of metal lids and rims and the associated degreasing and varnishing operations that resulted in releases of chlorinated solvents such as TCE and TCA, were discontinued in or about 1995, before Defendant Greif's acquisition.

42. Accordingly, Defendant Greif's liability is premised upon its succession to KMI Continental Fibre Drum, Inc.'s Site operations, its post-1998 ownership and operation of the same industrial facility, and the continued presence and migration of hazardous substances at the Site, including TCE, TCA, other VOCs, SVOCs, and petroleum-related contaminants.

43. Defendant Greif also continued to use the same operational and source areas historically associated with releases at the Site, including the former varnish pit, former varnish underground storage tank area, former drum storage area, flammable-materials handling areas, loading areas, and related storage and production areas until on or about December 2020, when, according to NYSDEC records and upon information and belief, the Site's industrial operations ceased.

44. Upon further information and belief, during Defendant Greif's ownership and operation of the Site, hazardous substances remained present and continued to be released,

disposed of, and/or migrate within soil, groundwater, and soil vapor at and from the same operational source areas used during prior ownership periods.

45. On or about July 16, 2021, Plaintiff Midwest acquired title to the Site from Greif Packaging LLC. *See* Ex. E.

46. At the time Midwest acquired the Site, the Site remained subject to ongoing environmental conditions resulting from decades of prior industrial operations conducted by The Continental Group, Defendant Sonoco, and Defendant Greif, and Defendant Crown as successor to The Continental Group, as well as the prior incomplete and inadequate remedial efforts performed under the VCP.

47. Following its acquisition, Midwest enrolled the Site in the New York State Brownfield Cleanup Program and entered into a Brownfield Cleanup Agreement with NYSDEC, effective June 13, 2022, in order to investigate, remediate, and redevelop the Site. *See* Ex. F.

48. Subsequent environmental investigations conducted both prior to and after Midwest's acquisition revealed that contamination at the Site is significantly more extensive, persistent, and deeper than reasonably understood at the time of purchase, including soil contamination exceeding applicable soil cleanup objectives and groundwater contamination exceeding New York State groundwater quality standards, notwithstanding prior remediation efforts undertaken during the VCP. Contamination also remains present both beneath and beyond areas previously subject to excavation and remediation, including within the former varnish underground storage tank area and former drum storage areas, where prior remedial actions failed to eliminate underlying contamination.

49. Groundwater contamination at the Site remains severe to date, with reported concentrations of chlorinated VOCs as high as approximately 833,800 micrograms per

liter in the vicinity of the former varnish pit, demonstrating the persistence and severity of current contamination despite prior remedial efforts. Soil vapor contamination also persists beneath the building footprint, including elevated concentrations of chlorinated VOCs despite the installation and operation of mitigation systems, indicating that contaminant sources remain active and continue to pose a risk of vapor intrusion.

50. As a result of these conditions, Plaintiff Midwest has been required to undertake substantial additional investigation, monitoring, and remediation efforts beyond what was reasonably anticipated at the time of acquisition in order to address contamination caused by decades of prior industrial operations at the Site.

51. The contamination presently existing at the Site, and the response costs incurred and to be incurred by Plaintiff Midwest, are directly attributable to the manufacturing, coating, varnishing, degreasing, storage, and material handling operations conducted by The Continental Group, Defendant Sonoco, Defendant Greif, and Defendant Crown as successor to The Continental Group, and the releases of hazardous substances associated with those operations.

**THE PARTIES**

52. Plaintiff Midwest Storage Developers, LLC is a limited liability company with an office for the transaction of business at 323 Columbia Street, Suite 300, Lafayette, Indiana 47901. Plaintiff acquired title to the Site on July 16, 2021 and thereafter entered the NYSDEC's BCP for the Site. *See* Exs. E and F.

53. Defendant Crown Cork & Seal Company, Inc. (now known as Crown Holdings, Inc.) ("Crown") is a Pennsylvania corporation with its principal executive offices at 9300 Ashton Road Philadelphia, Pennsylvania 19136.

54. Upon information and belief, following the 1984 acquisition of The Continental Group by KMI and the subsequent breakup and sale of The Continental Group's business divisions, Crown acquired substantial portions of the Continental Can Company, Inc.'s U.S. metal packaging and related domestic packaging operations in transactions occurring in or about 1990 and 1991.

55. Upon further information and belief, those acquired operations included portions of The Continental Group's U.S. metal packaging business that were part of the same business lines responsible for ownership and operation of the Site during the period from approximately 1948 through 1985, when hazardous releases occurred.

56. Upon further information and belief, Crown continued those acquired business operations and expressly or impliedly assumed liabilities arising from the acquired business lines, including liabilities associated with the Site's facilities, operations, and environmental conditions connected to those business lines. Crown is therefore named as a successor entity to The Continental Group under common law principles, including express or implied assumption of liabilities, de facto merger, and/or mere continuation, based on its

acquisition and continuation of The Continental Group's business operations that may include liabilities associated with the ownership and operation of the Site.

57. Defendant Sonoco Products Company is a South Carolina corporation with its principal executive offices at 1 North Second Street, Hartsville, South Carolina 29550.

58. Sonoco acquired the fibre drum manufacturing operations conducted at the Site in or about 1985 through its acquisition of KMI Continental Fibre, constituting a merger, consolidation, or continuation of the predecessor business for purposes of successor liability.

59. Following that acquisition, Sonoco continued those same industrial operations at the Site, including fibre drum, metal lids and rims manufacturing and related coating, varnishing, and degreasing processes involving hazardous substances and other petroleum-related materials.

60. Defendant Greif is a Delaware corporation with its principal offices located at 425 Winter Road, Delaware, Ohio 43015.

61. Upon information and belief, in March 1998, Greif Brothers Corporation (now Greif, Inc.) acquired Sonoco's industrial container business, including all outstanding shares of KMI Continental Fibre, Sonoco's wholly owned subsidiary that operated the fibre drum manufacturing operations at the Site, and thereby became the successor entity to those operations.

62. Upon information and belief, this transaction constituted a merger, consolidation, or continuation of the predecessor business for purposes of successor liability.

63. Upon information and belief, Defendant Greif continued to operate the Site as an industrial manufacturing facility through December 2020. Defendant Greif is further identified in the chain of title as a prior owner of the Site. *See* Ex. C.

**FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**CERCLA Cost Recovery – 42 U.S.C. § 9607(a)**

64. Plaintiff repeats, reiterates, and re-alleges each and every allegation that is set forth in paragraphs 1 through 63 of this Complaint with the same force and effect as though fully set forth at length herein.

65. The Site located at 2122 Colvin Boulevard, Tonawanda, New York constitutes a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9), in that it is a site or area where hazardous substances have been disposed of, stored, or otherwise come to be located.

66. At all relevant times, Defendants were "covered persons" within the meaning of 42 U.S.C. § 9607(a), including, without limitation, as current and/or former owners and operators of the Site at the time of disposal of hazardous substances, and/or, with respect to Defendant Crown Cork & Seal Company, Inc. a/k/a Crown Holdings, Inc., as a successor to entities that owned and/or operated the Site at the time of such disposal.

67. Hazardous substances, including but not limited to VOCs, TCE, TCA, and petroleum-related compounds including benzene, toluene, ethylbenzene, and xylenes, and SVOCs have been released into the environment at the Site within the meaning of CERCLA, 42 U.S.C. § 9601(22), including but not limited to being released into the soil, groundwater and soil vapor.

68. As a direct and proximate result of the releases and threatened releases of hazardous substances at the Site, Plaintiff has incurred and will continue to incur necessary response costs, including costs of investigation, remediation, monitoring, and related response actions.

69. The response actions undertaken and to be undertaken by Plaintiff are consistent with the National Contingency Plan, 40 C.F.R. Part 300.

70. Pursuant to CERCLA § 107(a), Defendants are jointly and severally liable to Plaintiff for all necessary costs of response incurred by Plaintiff in connection with the Site, including all past and future response costs incurred directly by Plaintiff.

**SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**CERCLA Contribution – 42 U.S.C. § 9613(f)**

71. Plaintiff repeats, reiterates, and re-alleges each and every allegation that is set forth in paragraphs 1 through 70 of this Complaint with the same force and effect as though fully set forth at length herein.

72. To the extent Plaintiff is determined to be a "covered person" under CERCLA, or is otherwise found liable for response costs at the Site, Plaintiff seeks contribution from Defendants pursuant to 42 U.S.C. § 9613(f).

73. Defendants are liable under CERCLA as persons who owned and/or operated the Site at the time of disposal and/or releases of hazardous substances, and/or, as successors to such entities, and share common liability with Plaintiff for contamination at the Site.

74. In the event Plaintiff is required to pay response costs pursuant to a judgment, settlement, administrative order, or other resolution of liability, such payments will represent amounts Plaintiff is obligated to pay for response costs attributable, in whole or in part, to releases caused by Defendants, including amounts exceeding Plaintiff's equitable share of liability.

75. Plaintiff seeks contribution from Defendants for such reimbursed or allocated costs, which are separate and distinct from the response costs incurred directly by Plaintiff and recoverable under CERCLA § 107(a).

76. Defendants are liable to Plaintiff for their equitable share of such reimbursed or allocated costs, including any amounts Plaintiff pays in excess of its proportionate share of liability. Allocation of such costs shall be determined in accordance with equitable factors as the Court deems appropriate pursuant to 42 U.S.C. § 9613(f).

**THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**CERCLA Declaratory Relief – 42 U.S.C. § 9613(g)(2)**

77. Plaintiff repeats, reiterates, and re-alleges each and every allegation that is set forth in paragraphs 1 through 76 of this Complaint with the same force and effect as though fully set forth at length herein.

78. An actual and justiciable controversy exists between Plaintiff and Defendants concerning liability for response costs incurred and to be incurred at the Site.

79. Plaintiff has incurred necessary response costs within the meaning of CERCLA and will continue to incur additional response costs in the future in connection with ongoing investigation, remediation, monitoring, and compliance obligations at the Site.

80. Under 42 U.S.C. § 9613(g)(2), in any action for recovery of response costs under CERCLA § 107(a), the Court shall enter a declaratory judgment on liability for response costs that will be binding on the parties in any subsequent action or actions to recover further response costs.

81. Plaintiff is entitled to a declaration that Defendants are liable for all future response costs that Plaintiff will incur in connection with the Site.

82. Such declaratory relief is necessary to avoid multiple actions and to ensure that Defendants' liability for ongoing and future response costs is established in a single proceeding.

**<u>FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS</u>**
**(Private Nuisance)**

83. Plaintiff repeats, reiterates, and re-alleges each and every allegation that is set forth in paragraphs 1 through 82 of this Complaint with the same force and effect as though fully set forth at length herein.

84. The contamination at the Site, including the presence of hazardous substances present in soil, groundwater, and soil vapor, constitutes a condition that substantially and unreasonably interferes with Plaintiff's current use and enjoyment of the property.

85. Defendants, through their respective ownership, operation, and control of the Site and/or, through their status as successors to entities responsible for such ownership and operations, participated in the creation, continuation, and maintenance of the nuisance condition.

86. The interference caused by the contamination is substantial, as it has required Plaintiff to investigate, monitor, and remediate hazardous conditions at the Site, has impaired Plaintiff's ability to use and redevelop the property, and required Plaintiff to incur great costs and expense.

87. The interference is unreasonable, as it results from the unlawful release and continued presence of hazardous substances in the environment at the Site, which pose risks to human health and the environment and require ongoing regulatory oversight and remediation.

88. As a direct and proximate result of Defendants' actions and omissions, Plaintiff has suffered and will continue to suffer damages, including costs associated with the loss of use and enjoyment of its property.

**FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Trespass)**

89. Plaintiff repeats, reiterates, and re-alleges each and every allegation that is set forth in paragraphs 1 through 88 of this Complaint with the same force and effect as though fully set forth at length herein.

90. Defendants caused and/or permitted the release of hazardous substances into the environment at and from the Site, including through predecessor entities for which Defendants are liable as successors, including into the soil, groundwater, and subsurface of the Site during their respective periods of ownership and operation. Those hazardous substances physically entered and remain within the property now owned by Plaintiff without authorization or consent.

91. The continued presence of hazardous substances at and within the subsurface of the Site constitutes an ongoing physical invasion of Plaintiff's property.

92. As a direct and proximate result of this trespass, Plaintiffs have suffered and will continue to suffer damages, including, but not limited to, loss of use and enjoyment of the property, diminution in property value, costs of investigation, monitoring, and remediation, and other consequential damages.

**SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Common Law Contribution)**

93. Plaintiff repeats, reiterates, and re-alleges each and every allegation that is set forth in paragraphs 1 through 92 of this Complaint with the same force and effect as though fully set forth at length herein.

94. Defendants are joint tortfeasors who are responsible, in whole or in part, for the legacy contamination at the Site, including as successors to entities responsible for such contamination resulting from the unlawful release and continued presence of hazardous substances at the Site.

95. As a result of Defendants' acts and omissions, Plaintiff has incurred and will continue to incur costs and damages associated with the investigation, monitoring, remediation, and management of contamination at the Site for which Plaintiff is not responsible.

96. Plaintiff has paid, and will continue to pay, more than its equitable share of such costs and damages.

97. Pursuant to common law principles of contribution, Defendants are liable to Plaintiff for their respective equitable shares of all costs and damages incurred by Plaintiff in connection with the Site.

**SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Common Law Indemnification)**

98. Plaintiff repeats, reiterates, and re-alleges each and every allegation that is set forth in paragraphs 1 through 97 of this Complaint with the same force and effect as though fully set forth at length herein.

99. To the extent Plaintiff is held liable for any costs or damages associated with contamination at the Site, such liability arises solely from its status as the current owner of the property and not from any active wrongdoing by Plaintiff.

100. The contamination at the Site was caused by the acts and omissions of Defendants during their respective periods of ownership and operation, including through liabilities assumed as successors to such entities, including the release and handling of hazardous substances in connection with the prior industrial operations.

101. Defendants are therefore responsible for the contamination at the Site, and any liability imposed upon Plaintiff is purely vicarious and secondary as compared to the active industrial Site operations conducted under Defendants.

102. Accordingly, Defendants are obligated to indemnify Plaintiff for all costs, damages, and expenses incurred by Plaintiff in connection with the damages incurred as a result of the contamination at the Site.

## EIGHTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
**(Unjust Enrichment)**

103. Plaintiff repeats, reiterates, and re-alleges each and every allegation that is set forth in paragraphs 1 through 102 of this Complaint with the same force and effect as though fully set forth herein.

104. Defendants, through their respective ownership, operation, and control of the Site, and/or, through their status as successors to entities that owned and/or operated the Site, obtained economic benefits from industrial operations conducted at the Site without bearing the full costs associated with the environmental contamination caused by those operations.

105. Defendants further benefited from the use of the Site for decades of industrial manufacturing operations while failing to fully remediate contamination resulting from those operations.

106. As a result of Defendants' conduct, Plaintiff has been required to incur substantial costs to investigate, monitor, and remediate contamination at the Site that Defendants caused.

107. It would be inequitable and unjust for Defendants to retain the benefits of their prior operations at the Site while shifting the costs of addressing the resulting contamination to Plaintiff.

108. Accordingly, Defendants have been unjustly enriched at Plaintiff's expense and are liable to Plaintiff in an amount to be determined at trial.

**NINTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Declaratory Judgment – 28 U.S.C. § 2201)**

109. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in paragraphs 1 through 108 of this Complaint with the same force and effect as though fully set forth herein.

110. An actual and justiciable controversy exists between Plaintiff and Defendants regarding their respective rights, duties, and obligations arising from the contamination at the Site.

111. Plaintiff contends that Defendants are responsible, in whole or in part, for the contamination at the Site and are liable under multiple common law theories including, but not limited to, private nuisance, trespass, contribution, indemnification, and unjust enrichment.

112. Plaintiff has incurred and continues to incur costs and damages associated

with investigation, monitoring and remediation of the Site and restrictions on the Site's use.

113. Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaratory judgment establishing the respective rights and obligations of the parties under the common law, including a declaration that Defendants are responsible for the contamination at the Site and are obligated to compensate, reimburse, indemnify, and/or contribute to Plaintiff for all past and future costs and damages arising therefrom.

**TENTH CAUSE OF ACTION**
**AGAINST DEFENDANT SONOCO PRODUCTS COMPANY**
**(New York Navigation Law § 181)**

114. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in paragraphs 1 through 113 of this Complaint with the same force and effect as though fully set forth herein.

115. On or about June 28, 1993, a petroleum discharge of an unknown amount occurred at the Site located at 2122 Colvin Boulevard, Tonawanda, New York, as documented in NYSDEC's Spill Incidents Database under Spill Number 9304022.

116. The spill record identifies the spill location as Sonoco Fiber Drum at 2122 Colvin Blvd., Tonawanda, and occurred approximately two years after the KMI Continental Fibre had been formally renamed to reflect Sonoco's acquisition of the entity.

117. The spill record further identifies the material discharged as gasoline and the resource affected as soil, making Defendant Sonoco a discharger within the meaning of Navigation Law § 172(8).

118. As a result of the discharge at the Site, Plaintiff has incurred and will continue to incur costs associated with the investigation, monitoring, management, and

remediation of petroleum contamination at the Site.

119. Accordingly, Defendant Sonoco Products Company is liable to Plaintiff for all cleanup and removal costs and damages resulting from the petroleum discharge at the Site pursuant to New York Navigation Law § 181.

**ELEVENTH CAUSE OF ACTION**
**AGAINST DEFENDANTS CROWN AND GREIF INC.**
**(New York Navigation Law § 181)**

120. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in paragraphs 1 through 119 of this Complaint with the same force and effect as though fully set forth herein.

121. Throughout the 2122 Colvin Boulevard Site's history, Defendants Crown, Sonoco, and Greif Inc. owned, operated, controlled, and/or were otherwise responsible for activities at the Site.

122. Petroleum-related compounds including benzene, toluene, ethylbenzene, and xylenes, and SVOCs have been identified at the Site.

123. To the extent such contamination is not attributable to the June 1993 petroleum discharge identified in NYSDEC Spill Number 9304022 associated with Defendant Sonoco, such contamination is attributable to Defendants Crown and Greif Inc.

124. Defendants Crown and Greif Inc. are "dischargers" within the meaning of New York Navigation Law § 172(8).

125. Upon information and belief, Defendants Crown and Greif Inc. caused, contributed to, and/or exacerbated such petroleum contamination through their handling, storage, use, and/or disposal of petroleum products at the Site.

126. As a result of the discharge(s) attributable to these Defendants, Plaintiff has incurred and will continue to incur costs associated with the investigation, monitoring, management, and remediation of petroleum contamination at the Site.

127. Accordingly, Defendants Crown and Greif Inc. are jointly and severally liable to Plaintiff for all cleanup and removal costs and damages resulting from such petroleum discharge(s) pursuant to New York Navigation Law § 181.

**WHEREFORE**, Plaintiff Midwest Storage Developers, LLC respectfully demands judgment against Defendants as follows:

a. On the First Cause of Action, awarding Plaintiff all past and future response costs incurred at the Site pursuant to CERCLA, 42 U.S.C. § 9607(a);

b. On the Second Cause of Action, awarding Plaintiff contribution from Defendants pursuant to CERCLA, 42 U.S.C. § 9613(f), for all reimbursed or allocated response costs incurred by Plaintiff in excess of its equitable share of liability;

c. On the Third Cause of Action, awarding Plaintiff declaratory relief pursuant to CERCLA, 42 U.S.C. § 9613(g)(2), establishing Defendants' liability for all future response costs;

d. On the Fourth Cause of Action (Private Nuisance), awarding Plaintiff compensatory damages in an amount to be determined at trial, including but not limited to costs of investigation, monitoring, remediation, and loss of use and enjoyment of the property;

e. On the Fifth Cause of Action (Trespass), awarding Plaintiff compensatory damages in an amount to be determined at trial resulting from the unauthorized physical invasion of hazardous substances onto the property;

f. On the Sixth Cause of Action (Common Law Contribution), awarding Plaintiff Defendants' equitable share of all costs and damages incurred by Plaintiff in connection with the Site;

g. On the Seventh Cause of Action (Common Law Indemnification), awarding Plaintiff full indemnification for all costs, damages, and expenses incurred by Plaintiff in connection with the contamination at the Site;

h. On the Eighth Cause of Action (Unjust Enrichment), awarding Plaintiff restitution in an amount to be determined at trial for the benefits unjustly retained by Defendants;

i. On the Ninth Cause of Action (Declaratory Relief), declaring the respective rights, duties, and obligations of Plaintiff and Defendants under the applicable common law with respect to contamination at the Site;

j. On the Tenth and Eleventh Causes of Action (Navigation Law Claims) awarding Plaintiff all cleanup and removal costs and all direct and indirect damages resulting from the petroleum discharges at the Site, and awarding Plaintiff its attorneys' fees, costs, and expenses pursuant to New York Navigation Law § 181(5);

k. Awarding Plaintiff pre-judgment and post-judgment interest as permitted by law;

l. Awarding Plaintiff the costs and disbursements of this action; and

m. Granting such other and further relief as the Court deems just and proper.

Dated: June 24, 2026
Buffalo, NY

**RUPP PFALZGRAF LLC**
*Attorneys for Plaintiff*

By: ______________________________

Marc A. Romanowski, Esq.
424 Main Street, 1600 Liberty Building
Buffalo, New York 14202
Tel: (716) 854-3400
romanowski@rupppfalzgraf.com

**VERIFICATION**

STATE OF INDIANA)
) ss:
COUNTY OF BOONE)

David Hood, being duly sworn, deposes and says:

I am Owner, of Midwest Storage Developers, LLC, the Plaintiff in the above-captioned action. I have read the foregoing Verified Complaint and know its contents. The document is true to my own knowledge, except as to matters stated on information and belief, and as to those matters, I believe them to be true.

I affirm this 28 Day of Jume, 2026, under penalties of perjury that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Dated: June 28, 2026
Zionsville, Indiana

David Hood (Jun 26, 2026 11:23:55 EDT)
David Hood

# Verified Complaint

Final Audit Report 2026-06-26

| | |
|---|---|
| Created: | 2026-06-25 |
| By: | Barbara Hyland (Hyland@ruppbaase.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAHO1m79fHpiVGKTItnv0az-fu_iXphb1T |

## "Verified Complaint" History

Document created by Barbara Hyland (Hyland@ruppbaase.com)
2026-06-25 - 1:58:29 PM GMT

Document emailed to david.igdevelopment73@gmail.com for signature
2026-06-25 - 1:59:35 PM GMT

Email viewed by david.igdevelopment73@gmail.com
2026-06-26 - 3:13:16 PM GMT

Signer david.igdevelopment73@gmail.com entered name at signing as David Hood
2026-06-26 - 3:23:53 PM GMT

Document e-signed by David Hood (david.igdevelopment73@gmail.com)
Signature Date: 2026-06-26 - 3:23:55 PM GMT - Time Source: server - Signature Appearance Selected: MOBILE_DRAW

Agreement completed.
2026-06-26 - 3:23:55 PM GMT

Adobe Acrobat Sign